WESTERN NEW YORK & P. R. CO. et al. v. PENN REFINING CO., Limited, OF OIL CITY, PA. (two cases).

(Circuit Court of Appeals, Third Circuit.   May 1, 1905.)

Nos. 2, 3.

1. INTERSTATE COMMERCE—EXCESSIVE CHARGES—ORDER OF REPARATION—EXECUTION.

Interstate Commerce Act, § 16 (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]), as amended by Act March 2, 1889, c. 382, § 5, 25 Stat. 859 [U. S. Comp. St. 1901, p. 3167], provides that whenever any common carrier, as defined in such act, shall violate, refuse, or neglect to obey any lawful order or requirement of the commission, not founded on a controversy requiring a trial by jury, it shall be lawful for the com-

mission or any person interested to apply in a summary way by a petition to the Circuit Court of the United States sitting in equity for the enforcement of such order; and, if the matters involved require a trial by jury, it shall be lawful for any person interested to apply to a court of the United States sitting as a court of law to fix a time for a trial of the case, etc. *Held*, that the Interstate Commerce Commission, though clothed with quasi judicial functions, being an administrative body, no "lawful order" referred to in section 16, was self-executing.

2. SAME—EVIDENCE—FINDINGS OF COMMISSION—CONCLUSIONS OF LAW.

The mere opinions of the Interstate Commerce Commission are inadmissible in an action brought for the enforcement of an order of pecuniary reparation.

3. SAME.

Interstate Commerce Act, § 16, as amended by Act Cong. March 2, 1889, c. 382, § 5, 25 Stat. 859 [U. S. Comp. St. 1901, p. 3167], providing that the findings of fact of the Interstate Commerce Commission shall be prima facie evidence of the facts found in a subsequent proceeding to enforce the commission's order, contemplated that the findings of fact should be so prepared and arranged in the commission's report that they could be offered in evidence unaccompanied by extraneous or incompetent legal arguments, opinions, or other conclusions.

4. SAME — DISCRIMINATION — REMEDIES — INTERSTATE COMMERCE COMMISSION— ORDERS.

Under Interstate Commerce Act Feb. 4, 1887, c. 104, § 9, 24 Stat. 382 [U. S. Comp. St. 1901, p. 3159], providing that any person claiming to be damaged by violation of the act may make complaint to the commission thereby created, or bring suit to recover damages sustained, where plaintiff elected to proceed by a complaint to the commission, he was thereafter confined to the remedy provided by the act.

5. SAME—APPEAL.

The law allows no appeal from or writ of error to review a decision of the Interstate Commerce Commission denying or awarding reparation for an alleged violation of the act.

6. SAME.

The lawfulness of an order of reparation issued by the Interstate Commerce Commission does not necessarily depend on a sufficiency of evidence adduced before the commission, but on the existence of facts, whether disclosed or not before that body, warranting the reparation ordered; and in an action to enforce such reparation it is sufficient that such facts be established by proper evidence.

7. SAME.

Though an action to recover pecuniary reparation ordered by the Interstate Commerce Commission is triable de novo, the cause of action must have been included in the order of reparation, and have constituted the whole or part of the basis of such order. whether the proceeding to enforce the same is in equity or at law.

8. SAME—RAILROADS—LEASE.

Where a railroad company owning a part of the through route over which oil was transported under an alleged discriminating rate leased its line to another company, and the lessee, by virtue of the lease or otherwise, was not a partner, agent, or representative of the lessor company during the time the former was operating such portion of the through route, the lessor was not personally liable for violation of the interstate commerce act by the lessee's participation in such discriminating rate during the continuance of the lease.

9. SAME—PROCEEDINGS—PARTIES—ORDERS.

Where a lessee railroad company operated a part of a through route over which oil was transported under an alleged discriminating rate, but was not a party to a proceeding before the Interstate Commerce Commission to recover reparation, an order in favor of petitioners including dis-

criminating freight charges by such lessee company was neither conclusive nor effective as to it.

10. SAME—PARTIES—RECEIVERS—PERSONAL LIABILITY.

Since execution cannot issue against the property of a railroad company in the hands of a receiver appointed by a federal court to enforce a judgment for damages sustained by the charge of discriminating freight rates in violation of the interstate commerce act, the receiver as such should not be joined with other railroad companies constituting a through route, against which the judgment would constitute a personal liability, to be enforced by execution at law.

11. SAME—CLAIMS—FAILURE OF PROOF—LIMITATION.

Where an order for the sale of the assets of a railroad company on mortgage foreclosure provided that any claims not included in the receivers' statements, and which shall not have been presented in writing to the receivers, or filed with the clerk of the court prior to the delivery of possession of the property, shall be presented for allowance and filed within six months after the first publication by the receivers of a notice to the holders of such claims to present the same for allowance, and declaring that claims not so presented shall not be enforceable against the receivers nor against the property or the purchasers, an alleged liability of the receivers for participating in a through freight rate which was in violation of the interstate commerce act, not so presented, was unenforceable either against the receivers or the succeeding corporation.

12. SAME—DISCHARGE OF RECEIVERS.

Where receivers of a railroad company had been finally discharged and released from all liability on their bonds more than four years before the bringing of an action to enforce an interstate commerce reparation order for an alleged participation by the receivers in an illegal freight rate, and there was no evidence of any vacation of the orders of discharge, or any application in that behalf, the receivers were not liable as such.

13. SAME—RATES—REASONABLENESS—QUESTION FOR JURY.

In an action to enforce an interstate commerce reparation order based on a discriminating freight rate, whether such rate was just and reasonable or unreasonable and excessive is a question for the jury.

In Error to the Circuit Court of the United States, for the Western District of Pennsylvania.

Francis I. Gowen and John G. Johnson, for plaintiffs in error.

M. J. Heywang, Eugene Mackey, J. W. Lee, and S. S. Mehard, for defendant in error.

Before DALLAS and GRAY, Circuit Judges, and BRADFORD, District Judge.

BRADFORD, District Judge.   The questions before us arise on writs of error to the circuit court of the United States for the western district of Pennsylvania in two statutory actions brought April 11, 1901, by the Penn Refining Company, Limited, of Oil City, Pennsylvania, for the recovery of certain sums of money respectively mentioned in two orders of reparation in its favor made October 22, 1895, by the Interstate Commerce Commission, together with interest.   One of these actions, No. 23 May Term, 1901, was brought against the Western New York and Pennsylvania Railroad Company and Samuel G. De Coursey, receiver thereof, the Western New York and Pennsylvania Railway Company and the Lehigh Valley Railroad Company, and the other, No. 25 May Term, 1901, against the Western New York and Pennsylvania Railroad

Company and Samuel G. De Coursey, receiver thereof, the Western New York and Pennsylvania Railway Company, the New York, Lake Erie and Western Railroad Company and J. G. McCullough and E. B. Thomas, the receivers thereof, the Erie Railroad Company and the Delaware and Hudson Canal Company. In No. 23 a verdict for the plaintiff was found May 23, 1902, for $12,706.92, and in No. 25 a verdict for the plaintiff was found on the same day for $514.30. Judgment on verdict was entered in each action February 12, 1903. The assignments of error in both cases by consent of counsel and as a matter of convenience were argued at the same time and appropriately may be considered in one opinion. The order of reparation on which action No. 23 is founded was made in proceedings, No. 154, before the Interstate Commerce Commission, instituted December 4, 1888, the Independent Refiners' Association of Titusville, Pennsylvania, and the Independent Refiners' Association of Oil City, Pennsylvania, being the petitioners, and the Western New York and Pennsylvania Railroad Company, the New York, Lake Erie and Western Railroad Company and the Lehigh Valley Railroad Company being the original respondents. The order of reparation on which action No. 25 is founded was made in proceedings, No. 153, before the commission, also instituted December 4, 1888, the same refiners' associations being the petitioners, and the Western New York and Pennsylvania Railroad Company, the New York, Lake Erie and Western Railroad Company, the Delaware and Hudson Canal Company, the Fitchburg Railroad Company and the Boston and Maine Railroad Company being the original respondents. It appears that the plaintiff below was and is a member of the Independent Refiners' Association of Oil City, Pennsylvania. The order of reparation in proceeding No. 154 is as follows:

"The claimant, the Penn Refining Company, Limited, of Oil City, Pa., is entitled to recover from the defendant, the Western New York & Pennsylvania Railroad Company and Samuel G. De Coursey, the receiver thereof, and the defendant, the Lehigh Valley Railroad Company, the sum of eight thousand five hundred and seventy nine dollars ($8,579.00) as reparation for damage resulting to said claimant from excessive and unlawful transportation charges exacted upon shipments of petroleum oil in barrels delivered by said claimant to said Western New York & Pennsylvania Railroad Company, or to its said receiver, for transportation over the Western New York & Pennsylvania Railroad and the Lehigh Valley Railroad from Oil City, Pa., to Perth Amboy, N. J., which said shipments of oil in barrels were so transported over said railroads between the 3rd day of September, 1888, and the 15th day of May, 1894, as appears from claim filed and statement thereon made by said Western New York & Pennsylvania Railroad Company and its said receiver; and the said Western New York & Pennsylvania Railroad Company and Samuel G. De Coursey the receiver thereof, and the Lehigh Valley Railroad Company are hereby ordered and required to pay to the claimant, the Penn Refining Company, Limited, the said sum of eight thousand five hundred and seventy nine dollars ($8,579.00), together with interest thereon at the rate of 6 per cent. per annum from May 15, 1894."

The order of reparation in proceedings No. 153 is as follows:

"The claimant, the Penn Refining Company, Limited, of Oil City, Pa., is entitled to recover from the defendant, the Western New York & Pennsylvania Railroad Company and Samuel G. De Coursey, the receiver thereof, and the

defendant, the New York, Lake Erie & Western Railroad Company and J. G. McCullough and E. B. Thomas, the receivers thereof, and the defendant, the Delaware & Hudson Canal Company, the sum of three hundred and forty three dollars and fifty eight cents ($343.58), as reparation for damage resulting to said claimant from excessive and unlawful transportation charges exacted upon shipments of petroleum oil in barrels delivered by said claimant -to said Western New York & Pennsylvania Railroad Company or to its said receiver for transportation over the Western New York and Pennsylvania Railroad, the New York, Lake Erie and Western Railroad the Delaware and Hudson Canal Co.'s railroad and the Central Railroad of New Jersey from Oil City, Pa., to Newark, N. J., which said shipments of oil in barrels were so transported over said railroads between the 3rd day of September, 1888, and the 15th day of May, 1894, as appears from claim filed and statement thereon made by said Western New York and Pennsylvania Railroad Company and its said receiver; and the said Western New York and Pennsylvania Railroad Company and Samuel G. De Coursey, the receiver thereof, and the New York, Lake Erie and Western Railroad Company, and J. G. McCullough and E. B. Thomas, the receivers thereof, and the Delaware & Hudson Canal Company are hereby ordered and required to pay to the claimant the Penn Refining Company, Limited, the said sum of three hundred and forty three dollars and fifty eight cents ($343.58), together with interest thereon at the rate of 6 per cent per annum from May 15, 1894."

The plaintiff below recovered in each action judgment for the full amount awarded in the order of reparation, together with interest at the specified rate from May 15, 1894. The independent refiners' associations in their petitions in cases No. 153 and No. 154 before the commission alleged in substance, among other things, that they were composed of a number of separate and distinct refining companies organized for the purpose of obtaining from railroad companies equal, reasonable and just rates of freight for refined petroleum and its products, manufactured and sold by the members of the petitioning associations at and from works owned and operated by them in the oil regions of Pennsylvania at or near Titusville and Oil City respectively; that in the conduct of their business the members of the petitioning associations had for several years shipped from their works large quantities of petroleum over the railroads of the respondents; and that the respondents as common carriers engaged in interstate commerce had violated the provisions of the interstate commerce act of February 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154], in establishing and collecting from the members of the petitioning associations excessive, unjust and unreasonable through rates and charges for the transportation over the lines of the respondents of petroleum in barrels in carload lots, and in giving an undue and unreasonable preference or advantage to shippers of petroleum and its products other than the members of the petitioning associations, and in subjecting the latter to an undue and unreasonable prejudice and disadvantage. In each case the petitioners prayed, among other things, that the commission would order the respondents to desist from the acts complained of and to make such reparation in the premises to the petitioners as should be found just and proper. The assignments of error are numerous and it is unnecessary to take them up seriatim and give to each a separate consideration. They may in each case be divided into three groups, raising respectively three classes of questions, namely, those relating to the conduct of

the trial in the court below, those relating to the lawfulness of the order of reparation, and those in other respects bearing upon the validity of the judgment recovered.

In each action error has been assigned by all the defendants therein to the admission in evidence of a paragraph from the report of the commission containing the following allegations:

"After full investigation and mature consideration * * * we hold, that where both modes of transportation are employed by the carrier and the use of one, the tank car, is not open to shippers impartially but is practically limited to one class of shippers, the charge for the barrel package in barrel shipments in the absence of a corresponding charge on tank shipments, resulting in a greater cost of transportation to the shippers in barrels on like quantities of oil between like points of shipment and destination than to the tank shipper, is an unjust discrimination subjecting the barrel shipper to an unreasonable disadvantage and giving the tank shipper an undue advantage, and that no circumstances and conditions have been disclosed by the evidence in these cases authorizing such discrimination by any of the defendant carriers."

This statement was objected to as "not containing a finding of fact, but involving a conclusion of law." The objection was overruled, the learned district judge remarking, "We think the paraagraph constitutes a finding of fact, and the objections are therefore overruled." All of the paragraph with the exception of the concluding negative allegation that "no circumstances and conditions have been disclosed by the evidence in these cases authorizing such discrimination by any of the defendant carriers," consists of mere legal conclusions. Taken as a whole it is argumentative, and when pronounced and admitted by the court as "a finding of fact," was calculated unduly to influence and perchance to mislead the jury to the prejudice of the defendants by causing the belief, possibly on insufficient grounds, that the charge for the barrel package in barrel shipments of oil complained of was not reasonable and just as required by the interstate commerce act. The subject to which it related was of vital importance in the case. Whether the charge for the barrel package was reasonable and just, or unjust and excessive, was a question to be decided by the jury on proper evidence, and not on mere arguments and legal conclusions of the commission. The interstate commerce act, as originally passed, (24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]) manifestly contemplated and intended that pecuniary reparation in proper cases should be made to persons sustaining damage through the violation of its provisions by a common carrier subject thereto, whether proceedings were instituted by complaint before the commission, on the one hand, or, on the other, were brought in the first instance in a court of the United States. It provided that such a common carrier violating its provisions should be "liable to the person or persons injured thereby for the full amount of damage sustained in consequence of any such violation"; that "any person or persons claiming to be damaged" through such violation "may either make complaint to the Commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this act"; that, should complaint be made to the com-

mission and the carrier not "make reparation for the injury alleged to have been done" within a limited period, it should be the duty of the commission to investigate the same, and make "recommendation as to what reparation, if any, should be made by the common carrier to any party or parties who may be found to have been injured," and, if it should appear that "any injury or damage has been sustained by the party or parties complaining, or by other parties aggrieved in consequence of any such violation," to notify such common carrier to "make reparation for the injury so found to have been done  *  *  *  within a reasonable time, to be specified by the Commission." The commission, although clothed with quasi judicial functions, is an administrative body in contradistinction to a judicial tribunal. Kentucky & I. Bridge Co. v. Louisville & N. R. Co., 37 Fed. 567, 613, 2 L. R. A. 289; Int. C. C. v. Brimson, 154 U. S. 447, 474, 489, 14 Sup. Ct. 1125, 38 L. Ed. 1047; Int. C. C. v. Louisville & N. R. Co. (C. C.) 73 Fed. 409; Int. C. C. v. Cin., etc., R. Co. (C. C.) 64 Fed. 981. No "lawful order or requirement" of the commission, referred to in section 16 (24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]) executes itself. Should the carrier or carriers to whom it is directed not voluntarily obey it, it can be enforced only through judicial proceedings as provided for in that section. Under the act as originally passed such proceedings were solely in equity. As the constitutional guarantee of the right to trial by jury attaches to the enforcement in a federal court of an order or requirement of mere pecuniary reparation, there was no means to compel payment, and such order or requirement, if not a nullity, was at least ineffective. It was, consequently, the uniform practice of the commission, prior to the taking effect of the amendatory act of March 2, 1889, c. 382, 25 Stat. 855 [U. S. Comp. St. 1901, p. 3158] to decline to order, require or recommend pecuniary reparation. Councill v. Railroad Co., 1 Interst. Com. Com'n R. 339; Heck & Petree v. Railway Co., 1 Interst. Com. Com'n R. 495; Riddle, Dean & Co. v. Railroad Co., 1 Interst. Com. Com'n R. 594, 607; Rawson v. Railroad Co., 3 Interst. Com. Com'n R. 266; Macloon v. Railway Co., 5 Interst. Com. Com'n R. 84. Such refusal on the part of the commission was based on one or the other of two grounds; one of them being, as stated in Heck & Petree v. Railway Co., that "the claim for pecuniary damages made by complainants  *  *  *  presents a case at common law in which the defendants are entitled to a jury trial"; and the other, as stated in Rawson v. Railroad Co., that "as the statute provided for no trial by jury in the courts to enforce our awards in controversies such as were triable at Common Law and where more than twenty dollars was involved, we could award no reparation in consequence of the provisions of the seventh amendment to the Constitution of the United States." But by the act of March 2, 1889, c. 382, § 5, 25 Stat. 859 [U. S. Comp. St. 1901, p. 3167] § 16 (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165]) was so amended as to provide for trial by jury and judgment as at common law on the law side of the court in proceed-

ings for the .enforcement of orders or·requirements of the commission involving matters ·"founded upon a controversy requiring a ·trial by jury, as provided ·by the seventh amendment to the Constitution of the United States." In proceedings at law under section 16, as amended, for the enforcement of an order or requirement of the commission, the parties are entitled ·to an impartial trial by jury, so conducted as to accord to them in full measure the enjoyment of their constitutional right. The procedure contemplated by the act and, unless waived, required by the Constitution, is jury trial, accompanied with the usual safeguards furnished by a proper application of the principles of evidence and the proper submission of the case to the jury. Section 14 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3164]), as amended (Act March 2, 1889, c. 382, § 4, 25 Stat. 859 [U. S. Comp. St. 1901, p. 3164]), provides, among other things, as follows:

"That whenever an investigation shall be made by said commission, it shall be its duty to make a report in writing in respect thereto, which shall include the findings of fact upon which the conclusions of the Commission are based, together with its recommendation as to what reparation, if any, should be made by the common carrier to any party or parties who may be found to have been injured; and such findings so made shall thereafter, in all judicial proceedings, be deemed prima facie evidence as to each and every fact found."

And section 16 as amended provides with respect to proceedings at law in a circuit court of the United States in case of the disregard of a lawful order or requirement of the commission, among other things, that, where "the matters involved in any such order or requirement of said Commission are founded upon a controversy requiring a trial by jury, * * * at the trial the findings of fact of said Commission as set forth in its report shall be prima facie evidence of the matters therein stated." The act does not make the mere· legal opinions, arguments or reasons of the commission prima facie evidence or evidence of any kind in any judicial proceeding. It was not the intent of the act to introduce into proceedings for the recovery of pecuniary reparation awarded by the commission elements of uncertainty, complexity or confusion, foreign to any orderly system of juridical procedure. Not only did the paragraph in- question from the report of the commission include conclusions of law, but the jury was instructed that these conclusions were findings of fact. In this there was error tending to mislead and the assignment must, therefore, be sustained. The constitutionality of the provisions making "findings of fact" prima facie evidence before a jury has been challenged by sundry assignments of error, but is, we think, beyond reasonable question. The constitutional guarantee relative to trial by jury in the courts of the United States does not exclude legislative authority to effect convenient changes in the rules of evidence, in· volving no detriment to litigants.

In each of the two actions error has been assigned to the admission in evidence of the findings of fact as appearing in the report and order of· the commission on the· subject of reparation marked

Exhibit H. The court in overruling the objections made on the part of the defendants, among other things, said:

"The objections to the admission of this order as an order are overruled. The order is received in evidence, and its effect is restricted simply as showing the basis on which the statutory proceeding by the petition is based, and is not to have any binding effect as an order upon the jury; to this extent, and to this extent only, the order is admitted as such in evidence."

Had the learned judge stopped at this point probably the defendants would have had no just cause of complaint. But he proceeded as follows:

"As to the findings of fact contained or embraced in the order, we are of opinion that the objections thereto should be overruled. We are of opinion that these findings of fact are made prima facie evidence under the act of Congress."

Exhibit H is composed of heterogeneous matter, containing not only findings of fact, but legal arguments, opinions and other conclusions. It is fairly to be inferred from the provisions of sections 14 and 16 that the findings of fact were intended to be so arranged and set forth in the report of the commission that they could be offered as prima facie evidence of "each and every fact found", unaccompanied with extraneous, embarrassing or incompetent matter calculated to confuse or mislead.. Int. C. C. v. Louisville & N. R. Co. (C. C.) 73 Fed. 409, 414, 415. While not expressing the opinion that findings of fact even when mixed with incompetent matter should in all cases be excluded, we hold that, if the same be received, the court should clearly separate and distinguish before the jury the findings of fact from the incompetent matter, and direct that the latter be wholly disregarded. Unless this course be pursued the parties are deprived at least in part of the benefits or safeguards intended to be secured to them under the constitutional guarantee of trial by jury. In omitting in the present instance to follow such method we think there was error and that the assignments must be sustained.

There are other assignments of error in each of the two actions of the same general nature as those already considered, to which it is unnecessary particularly to allude. If the matter rested here, while a judgment of reversal would be necessary, it would be accompanied with a direction for a writ of venire facias de novo. But there are other assignments requiring our attention. In each of the two actions there are assignments of error to the following portion of the charge to the jury:

"The questions you are to ascertain are to be passed upon by you under the evidence in the case given before you, and your conclusions are to be reached by you without reference to these orders made by the interstate commerce commission. They may or may not have been justified in making their orders. But the question for you to determine is one independent and apart from the orders they have made, and it is a question to be determined by you under the evidence that has been given before you in this case, without respect to what prior orders have been made by this interstate commerce commission."

The orders referred to in this instruction included the order of reparation specifying the sum for which action was brought. The statement that the commission "may or may not have been justified

in making their orders" was directly calculated to impress ·the jury with an idea that the lawfulness or unlawfulness of the order of reparation was a wholly immaterial consideration and should in no way be permitted to influence its deliberations in reaching a verdict. This portion of the charge gives rise to two questions; first, whether it was necessary to a recovery that the order of reparation should have been lawful, in whole or in part, and, if so, secondly, whether relief not lawfully embraced in such order could be obtained by the plaintiff below. Section 9 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 382 [U. S. Comp. St. 1901, p. 3159]) provides, among other things, as follows:

"That any person or persons claiming to be damaged by any common carrier subject to the provisions of this act may either make complaint to the Commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this act, in any district or circuit court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt."

The plaintiff elected the method of procedure by complaint to the commission, and thereafter was confined to that remedy. One of the objects designed to be accomplished by such procedure is the making in a proper case of an order of pecuniary reparation. To this end the commission is clothed with authority to compel the attendance of witnesses and the production of evidence. It is true that the commission is without power to enforce such an order, and, unless it be voluntarily obeyed by those to whom it is directed, resort to judicial proceedings is necessary to obtain the relief covered by it. But that such relief may be obtained the order must be lawful. It is not sufficient that it be within the ·jurisdiction of the commission, if it be unlawful. The phrase "lawful order," as employed in section 16 as amended, implies more than the exercise of mere jurisdictional power or authority. In Int. Com. Com. v. Alabama Midland Ry., 168 U. S. 144, 159, 18 Sup. Ct. 45, 42 L. Ed. 414, distinguished counsel contended:

"The words 'lawful order' mean an order the Commission has jurisdiction to make. An order may be lawful and at the same time erroneous, so that if the Commission made an order in a matter over which they had jurisdiction, which was merely an error of judgment as to ·precisely the degree of reparation, for instance, the carrier ought to make, the order would still be lawful."

The court, however, with respect to this contention said:

"The first contention we encounter, upon this branch of the case, is that the Circuit Court had no jurisdiction to review the judgment of the Commission upon this question of fact; that the court is only authorized to inquire whether or not the commission has misconstrued the statute and thereby exceeded its power; that there is no general jurisdiction to take evidence upon the merits of the original controversy; and, especially, that questions under the third section are questions of fact and not of power, and hence unreviewable. We think this contention is sufficiently answered by simply referring to these portions of the act which provide that, when the court is invoked by the commission to enforce its lawful orders or requirements, the court shall proceed, as a court of equity, to ·hear and determine the matter, and in

such manner as to do justice in the premises. * * * It has been uniformly held by the several Circuit Courts and the Circuit Courts of Appeal, in such cases, that they are not restricted to the evidence adduced before the commission, nor to a consideration merely of the power of the commission to make the particular order under question, and that additional evidence may be put in by either party, and that the duty of the court is to decide, as a court of equity, upon the entire body of evidence."

It is essential that the order be warranted by the provisions of the act in connection with the principles of law involved in the proper application of these provisions to a given case. Not only must an order of pecuniary reparation be lawful, but no recovery by judicial proceedings under section 16 as amended can exceed, aside from interests and costs, the amount required by such order to be paid, nor be had for any cause not presented to the commission in the proceedings in which such order is made. It is incumbent on one claiming damages against a common carrier for alleged violation of the act, and electing to proceed by complaint to the commission, to apply to that body by petition briefly stating the facts. Thereupon a statement of the charges so made is forwarded by the commission to the carrier who is called upon "to satisfy the complaint or to answer the same in writing within a reasonable time, to be specified by the commission." If the carrier within the specified time makes reparation for the alleged injury, such carrier is wholly relieved from liability to the petitioner for the violation of law complained of. If, however, the carrier does not "satisfy the complaint" within the specified time it becomes the duty of the commission "to investigate the matters complained of." It is only because the carrier fails to satisfy the complaint that an investigation by the commission of the "matters complained of" is had. The regular course in conducting the investigation, save in exceptional cases not included in those now under consideration, is to take evidence only "after a cause or proceeding is at issue on petition and answer." In cases No. 153 and No. 154 (Independent Refiners' Ass'ns v. Western New York & P. R. Co., 6 Interst. Com. Com'n R. 378) this course was pursued. If on investigation it appears to the satisfaction of the commission by the testimony of witnesses or other evidence that a violation of law cognizable by that body has been committed by a common carrier whereby "injury or damage has been sustained by the party or parties complaining, or by other parties aggrieved in consequence of any such violation," the commission is authorized, and it is its duty, forthwith to "cause a copy of its report in respect thereto to be delivered to such common carrier, together with a notice to said common carrier to cease and desist from such violation, or to make reparation for the injury so found to have been done, or both, within a reasonable time, to be specified by the Commission." If within that time it appears to the commission that such carrier has ceased from such violation of law and has made reparation for such injury or damage "in compliance with the report and notice of the commission, or to the satisfaction of the party complaining, a statement to that effect shall be entered of record by the commission, and the said common carrier shall thereupon be relieved from

137 F.—23

further liability or penalty for such particular violation of law." It is only in case the carrier, having failed to satisfy the party or parties complaining, "shall violate or refuse or neglect to obey or perform" a lawful order of pecuniary reparation, that an action will lie for the recovery of the reparation so ordered, and it is necessary that the petition shall allege "such violation or disobedience as the case may be." To undertake to determine whether one, in suing for pecuniary reparation lawfully ordered by the commission, proceeds, on the one hand, for the enforcement of the lawful order of reparation, or, on the other, for the recovery of the reparation lawfully ordered, were to indulge in unprofitable refinement. It is enough for present purposes that in either view the substantial object of the action is the obtaining of reparation lawfully ordered to be paid. The law allows no appeal from a decision of the commission denying or awarding reparation, nor does a writ of error lie in such case. The lawfulness of an order of reparation does not necessarily depend upon a sufficiency of evidence adduced before the commission, but upon the existence of facts, whether or not disclosed to that body, warranting the reparation ordered; and in an action brought to obtain such reparation it is enough that such facts be established by proper evidence. Hence in such an action the parties are not confined to the evidence adduced before the commission during the investigation resulting in the order of reparation. They are at liberty either wholly or partially to rely upon the "findings of fact," made by the act prima facie evidence in any judicial proceeding "as to each and every fact found," or resort may be had by them or any of them to cumulative or other evidence. Int. Com. Com. v. Alabama Midland Ry., 162 U. S. 144, 175, 18 Sup. Ct. 45, 42 L. Ed. 414; Texas & Pac. Railway v. Interstate Com. Com., 162 U. S. 184, 196, 16 Sup. Ct. 666, 40 L. Ed. 940; Kentucky, etc., Co. v. Louisville & N. R. Co. (C. C.) 37 Fed. 567, 614, 2 L. R. A. 289; Int. Com. Com. v. Lehigh Val. R. Co. (C. C.) 49 Fed. 177; Int. Com. Com. v. Atchison, etc., R. Co. (C. C.) 50 Fed. 295; Int. Com. Com. v. East Tenn., etc., Ry. Co. (C. C.) 85 Fed. 107, 110; Int. Com. Com. v. Cin., etc., Ry. Co. (C. C.) 56 Fed. 925. The cause of action is examined de novo and the proceeding is in a qualified sense independent of the investigation by the commission. Detroit, etc., Ry. Co. v. Int. Com. Com., 74 Fed. 803, 839, 21 C. C. A. 103; Kentucky, etc., Co. v. Louisville & N. R. Co. (C. C.) 37 Fed. 567, 615, 2 L. R. A. 289; Shinkle, Wilson & Kreis Co. v. Louisville & N. R. Co. (C. C.) 62 Fed. 690, 693; Int. Com. Com. v. Cin., etc., Ry. Co. (C. C.) 56 Fed. 925. The commission in making an order of reparation may have been actuated by insufficient or erroneous reasons and the order nevertheless be valid if it be within the scope of the complaint made to that body. Int. Com. Com. v. Southern Pac. R. Co. (C. C.) 132 Fed. 829, 837; Int. Com. Com. v. East Tenn., etc., Ry. Co. (C. C.) 85 Fed. 107, 110. In the latter case the court said with respect to an erroneous ground upon which the commission based its order:

"In this undoubtedly it was in error. The contrary doctrine is now well established. But this error is not material. The legal reason given may be

wrong and the order right if, upon the facts, the latter should be found by the court to be warranted by law. Nor would it affect the duty of the court if the commission had founded its order upon one provision of the act, and the facts brought the case within some other. The question, therefore, is whether the order made was a lawful one in the circumstances as they are made to appear."

But the cause of action in a suit brought for the recovery of pecuniary reparation must have been included in the order of reparation and have constituted the whole or part of the basis of such order. Int. Com. Com. v. Louisville & N. R. Co. (C. C.) 73 Fed. 409, 413, 428; Detroit, etc., Ry. Co. v. Int. Com. Com., 74 Fed. 803, 840, 841, 21 C. C. A. 103; Int. Com. Com. v. Delaware, L. & W. R. Co. (C. C.) 64 Fed. 723; New York & N. Ry. v. New York & N. E. R. Co. (C. C.) 50 Fed. 867, 870; Int. Com. Com. v. Detroit Railway Co. (C. C.) 57 Fed. 1005, 1008, 1013. We do not perceive either on the authorities or on principle, with respect to the necessity that the substantive relief to be obtained, aside from interest and costs, should have been included in the order of the commission, any distinction between a suit in equity to enforce obedience to an order that a carrier shall desist from acts in contravention of the statute, and an action at law to recover pecuniary reparation where complaint has been made to the commission. This conclusion not only is a reasonable inference to be drawn from the various provisions of the act adverted to but is supported by other considerations. That the findings of fact by the commission on which its order for pecuniary reparation is founded should have been made prima facie evidence in an action for the recovery of such reparation is strongly indicative of a legislative intent that the demand for such reparation sought to be enforced in such action must be confined to such reparation as was considered by the commission and included in its order. In Cin. N. O. & Tex. Pac. Ry. v. Int. Com. Com., 162 U. S. 184, 196, 16 Sup. Ct. 700, 705, 40 L. Ed. 935, the court said:

"The Commission is an administrative board, and the courts are only to be resorted to when the Commission prefers to enforce the provisions of the statute by a direct proceeding in the court, or when the orders of the Commission have been disregarded. The theory of the act evidently is, as shown by the provision that the findings of the Commission shall be regarded as prima facie evidence, that the facts of the case are to be disclosed before the Commission. * * * The purposes of the act call for a full inquiry by the Commission into all the circumstances and conditions pertinent to the questions involved."

Further, the fact that where a remedy is sought for the recovery of damages resulting from a violation of the provisions of the act there must be an election between procedure by complaint to the commission and procedure by suit or action in the proper court, leads to the same conclusion. Both remedies cannot be pursued either contemporaneously or successively. To permit the recovery, in an action brought for violation of or disobedience to an order of pecuniary reparation, of damages not included in such order would involve judicial sanction of a virtual blending of both remedies in palpable disregard of the provision that the petitioner "shall not have the right to pursue both of said remedies," but

must in each case make an election between the two. We think there was substantial error in the portion of the charge just considered.

In each of the two actions error has been assigned by each of the defendants to the refusal of the court to charge the jury that there could be no recovery against them respectively. In addition to this general assignment, there was a specific assignment by the Lehigh Valley Railroad Company to the following portion of the charge in action No. 23:

"On the part of the Lehigh Valley Railroad Company, it is shown that on February 11, 1892, it leased its road to the Philadelphia & Reading Railroad Company, which latter continued to operate it under said lease until August 1, 1893. It is claimed on behalf of said road that for such period no damages can be found against it or recovered from it. In view of the fact that under the lease in question the Lehigh Valley Railroad Company was to be paid by the Reading Company a percentage on the gross earnings of the road during the lease, we are of opinion that the Lehigh Valley Railroad Company was not exempt from liability during the lease, if it was chargeable in other respects, and the plaintiff is entitled to recover against it in other respects. In view, however, of the admission of counsel for plaintiff that they have shown no shipments during said period and claim no reparation for such, it will be apparent to you that the question as to the giving of this lease need not concern the jury, and so I instruct you."

Section 8 of the act (Act Feb. 4, 1887, c. 104, 24 Stat. 382 [U. S. Comp. St. 1901, p. 3159]) provides, among other things, as follows:

"That in case any common carrier subject to the provisions of this act shall do, cause to be done, or permit to be done any act, matter or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act."

On the assumption that the conduct of and relationship between the defendants with respect to the through route from the oil regions in Pennsylvania to New York Harbor points, including Perth Amboy, were of such a character as to render all of them personally liable for the exaction by the initial carrier, or other defendants, of excessive and unjust freight charges, such liability on the part of any defendant would, save under exceptional circumstances, be confined to exactions occurring during the co-operation of that defendant with the others. In the absence of such special circumstances, we are not aware of any principle or ground on which one of the common carriers would incur liability on account of the exaction of illegal charges by other common carriers over the through route during a period when the former carrier was not co-operating with the others. Section 1 in defining the word "railroad" as employed in the act, certainly does not countenance such an idea of liability. So far as material in this connection, it provides that "the term 'railroad' as used in this act shall include * * * all the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement or lease." It appears from the record that there was evidence before the commission and also before the court below that part of the

amount included in the order of reparation sued on, and in the judgment, represented alleged illegal exactions of freight charges received while the Philadelphia and Reading Railroad Company was operating a portion of the through route under a lease from the Lehigh Valley Railroad Company. This fact is disclosed by the report of the commission of October 22, 1895, exhibit H, in connection with the copy of the lease set forth in the record. The commission said:

"On July 12, 1895, counsel for the defendant, the Lehigh Valley Railroad Company, suggested to the Commission, by the filing of an affidavit of John R. Fanshawe and copy of a lease of the Lehigh Valley Railroad to the Philadelphia and Reading Railroad Company, that for the period between February 11, 1892, and August 1, 1893, (a portion of the time covered by these reparation claims) the Lehigh Valley Railroad was operated by the Philadelphia and Reading Railroad Company, as lessee, under the terms of a lease bearing the date first mentioned; and that, during such time, the receipts from the operation of the Lehigh Valley road enured to and were received by the Philadelphia and Reading Railroad Company, and were not received by the defendant, the Lehigh Valley Railroad Company. Though the Philadelphia and Reading Company, as lessee, would be liable for injuries inflicted during its management of the road, that company is not a party to these proceedings. It is understood that the Lehigh Valley Railroad Company resumed operation of its properties under a clause in the lease providing for its termination at the option of the lessor company, in the event of the termination, for any reason whatsoever, of a certain agreement of even date therewith between the Lehigh Valley Coal Company and the Philadelphia and Reading Coal and Iron Company. There is thus raised in these proceedings the question whether the lessor company is liable to respond in damages to parties injured through non-performance of public duties as a common carrier during the operation of its railroad property by a lessee. * * * The Lehigh Valley Railroad Company, a common carrier subject to the provisions of the Act to Regulate Commerce, could not, by leasing its road, free itself from liabilities for practices made illegal by that statute; nor after resuming operation of its property pending proceedings against it to enforce statutory provisions so violated and to recover damages for injuries sustained under such violation, can it claim exemption from liability during the term of the lease."

Further, in Cattle Raisers' Association v. Railway Company, 7 Interst. Com. Com'n R. 513, 537, which report by virtue of section 14 is made "competent evidence of the reports and decisions of the Commission therein contained, in all courts of the United States * * * without any further proof or authentication thereof," the commission, referring to cases No. 153 and No. 154 (Independent Refiners' Ass'ns v. Western New York & P. R. Co., 6 Interst. Com. Com'n R. 378) said:

"In the matter of the Independent Refiners' Association, the Lehigh Valley Railroad was engaged in the discriminating practices complained of, and leased its road for a short time to the Philadelphia & Reading Railroad Company, by whom the practices were continued. Upon the termination of the lease the Lehigh Valley resumed possession of its property and still continued the same discriminations. The Commission held that the Lehigh Valley Company was liable for damages accruing to shippers by these unlawful practices during the period of the lease."

It does not appear that the Philadelphia and Reading Railroad Company was, by virtue of the lease or otherwise, a partner, agent or representative of the Lehigh Valley Railroad Company during the time the former company was operating a portion of the through

route under the lease, with respect to any benefit derived or to be derived through the exaction by it or any of the defendants of freight charges. Nor did the exaction during that time by the legislatively sanctioned lessee or any of the defendants, other than the lessor, of illegal freight charges, assuming them to have been such, belong to the category of torts for which the lessor could be held liable. The amount of such charges, though included, is not specified either in the order of reparation or in the judgment. Both were entire and in solido against all the defendants. Whatever may have been the amount of such charges, it is inseparable and indistinguishable from the balance of the sum ordered by the commission and adjudicated by the court below. The order was, therefore, for all practical purposes ineffective, and must be treated as unlawful and the judgment erroneous. But little need be said of the "admission of counsel for plaintiff that they have shown no shipments during said period and claim no reparation for such." There was uncontradicted evidence that there were shipments during that period and that the order of reparation, for the whole amount of which judgment was rendered, included alleged illegal freight charges in such period. While it was competent for the counsel for the plaintiff to admit away or waive the rights of their client, it was beyond their power to admit away or waive the right of the defendants to a valid defence. Further, the Philadelphia and Reading Railroad Company was not made a party either to the proceedings before the commission or to the action in the court below. It has never had its day in court. Whatever amount of alleged illegal freight charges may have been directly or indirectly exacted by it while operating a portion of the through route was assessed in proceedings to which it was a stranger, and in which it had no opportunity to make a defence. It, certainly, could not be concluded by the judgment; and that judgment, being entire, may be prejudicial to all the defendants therein with respect to the amount—whatever it may have been—included therein on account of freight charges by the Philadelphia and Reading Railroad Company. In the portion of the charge now under consideration we think there was error.

In each action error has been assigned to the following portion of the charge to the jury:

"In regard to the defendants, Samuel G. De Coursey, Receiver, and the Western New York and Pennsylvania Railway Company, it appears that the original company (that is, the Western New York and Pennsylvania Railroad Company), against which this petition was originally filed on December 4, 1888, went into the hands of Samuel G. De Coursey, as Receiver, on April 1, 1903. Prior thereto, to wit, on the 14th day of November, 1892, an order was made by the Interstate Commerce Commission against the Western New York and Pennsylvania Railroad Company, commanding it to desist from charging the rate complained of and ordering it to make reparation. It is alleged, (and upon this point we express no opinion, for you will notice that we leave some facts to be found by you), that thereafter, to wit, on the 22nd day of October, 1895, an order was made against the Receiver, Samuel G. De Coursey, among others, directing him, as Receiver of the road, and the Western New York and Pennsylvania Railroad Company, to make reparation to the plaintiff of th specific amount which has been read in evidence before you. It is alleged

that during this proceeding to thus ascertain the amount of reparation to be made, the Receiver was represented by counsel and took part in those proceedings and resisted the entry of the making of such an order. It is also alleged that he was notified of this order of reparation and declined to comply with the same. If you find the facts to be as above alleged, and you further find that the plaintiff has shown a right to recover against the Western New York and Pennsylvania Railroad Company, the original company, in other respects, and that the said railroad company united, as explained above, in making a through joint rate with the New York, Lake Erie and Western Railroad Company and the Delaware and Hudson Canal Company, and in so doing subjected refined oil in barrels to an undue and unreasonable prejudice or disadvantage, and that when the company ceased to operate its road and it passed into the hands of a Receiver, such Receiver continued to maintain such rate and declined to obey the desisting and reparation orders, and continued the litigation, then we are of opinion that by such acts and the adoption of the rate, the Receiver, as Receiver, had so acted that he should not be exempt from the verdict that this jury might find, if in other respects the plaintiff is entitled to recover a verdict. And as, under the decree of this Court, under which this road was sold to the Western New York and Pennsylvania Railway Company, the said company was made liable for liabilities incurred by the Receiver, we instruct you that if the plaintiff is entitled, under the foregoing instructions, to a verdict against the Receiver, the jury should be warranted in also rendering a verdict against the Western New York and Pennsylvania Railway Company."

It appears that the Western New York and Pennsylvania Railroad Company operated its portion of the through route from a date prior to September 3, 1888, until about April 1, 1893, when its property and affairs passed into the hands of De Coursey as receiver appointed by the circuit court of the United States for the western district of Pennsylvania; that the receiver continued to operate the portion of the through route in his hands as receiver from his appointment until March 31, 1895, when the property of the Western New York and Pennsylvania Railroad Company was acquired by the Western New York and Pennsylvania Railway Company by virtue of a judicial sale made under an order of the court having jurisdiction of the cause. The order of sale provided as follows:

"Such sale to be subject, however, to all executory contracts made by the Receiver in this suit under the authority of the Court, of which contracts the Receiver is directed to give the trustee a full and accurate statement; and subject, also, to all the debts and liabilities of the Receiver and to all after-maturing interest upon the first-mortgage bonds and all car-trust obligations and equipment notes now outstanding; such debts and liabilities, if any, will remain a lien upon the premises until discharged."

In each action the order of reparation in a lump sum is directed against the Western New York and Pennsylvania Railroad Company, De Coursey as receiver thereof, and the Western New York and Pennsylvania Railway Company, the purchaser, besides others. So far as the purchaser is concerned, the words "all the debts and liabilities of the receiver," in the order of sale, do not include all the debts and liabilities of the Western New York and Pennsylvania Railroad Company; for, as stated by Mr. Justice Miller in Hoard v. Chesapeake and Ohio Railway, 123 U. S. 222, 227, 8 Sup. Ct. 74, 31 L. Ed. 130, "if, as such purchasers, they thereby become bound to pay all the debts and perform all the obligations of the corporation whose property they bought, it would put an end to purchases of railroads." The or-

der specifies that the sale should be subject to all executory contracts made by the receiver by authority of the court, all after-maturing interest upon the first mortgage bonds and car-trust obligations, and equipment notes then outstanding; but the debts and liabilities of the receiver, which, with the items above mentioned, were to remain "a lien upon the premises until discharged" were manifestly debts and liabilities incurred by the receiver as such, and not by the Western New York and Pennsylvania Railroad Company. To hold the purchaser liable for them would involve a departure from the order of sale, and charge it with an unascertained portion of the alleged illegal overcharges for which it was in nowise responsible. With respect to the receiver, it may be said, that, aside from the act of March 3, 1887, c. 373, 24 Stat. 552 [U. S. Comp. St. 1901, p. 508], the allowance and enforcement of such a claim against a receiver as such is within the jurisdiction of the court appointing him and entertaining the receivership proceedings, although such court, if the facts be disputed, may in a proper case either of its own motion or at the instance of the parties alleging damage, or any of them, allow the receiver to be sued in a court of law or direct the trial of an issue to settle the facts. Barton v. Barbour, 104 U. S. 126, 26 L. Ed. 672; Porter v. Sabin, 149 U. S. 473, 479, 13 Sup. Ct. 1008, 37 L. Ed. 815. Section 3 of the act just mentioned (24 Stat. 554 [U. S. Comp. St. 1901, p. 582]) provides:

"That every receiver or manager of any property appointed by any court of the United States may be sued in respect of any act or transaction of his in carrying on the business connected with such property, without the previous leave of the court in which such receiver or manager was appointed; but such suit shall be subject to the general equity jurisdiction of the court in which such receiver or manager was appointed, so far as the same shall be necessary to the ends of justice."

In the case of In re Tyler, 149 U. S. 164, 182, 13 Sup. Ct. 785, 789, 37 L. Ed. 689, the court said:

"While the third section of the act of Congress of March 3, 1887, c. 373, 24 Stat. 552 [U. S. Comp. St. 1901, p. 508] now permits a receiver to be sued without leave, it also provides that 'such suit shall be subject to the general equity jurisdiction of the court in which such receiver or manager was appointed, so far as the same shall be necessary to the ends of justice.' Neither that, nor the second section, which provides that the receiver shall manage the property 'according to the valid laws of the State in which such property shall be situated,' restricts the power of the Circuit Courts to preserve property in the custody of the law from external attack."

It is, therefore, clear that the function of an action against a receiver in his official capacity, brought without leave of the court appointing him, to recover damages for an alleged tort committed by him while acting in such capacity, is to establish the amount of the plaintiff's claim, but in nowise to interfere with the custody, control and disposition by the court of the property of which it has taken possession in the receivership proceedings. Execution upon a judgment recovered in such an action cannot be enforced or legally issue against the property in custodia legis, and, consequently, the receiver as such should not be joined with others

against whom the judgment would constitute a personal liability to be enforced by execution at law. We think there was error in the portion of the charge just discussed.

In action No. 25 error has severally been assigned by the Erie Railroad Company to the refusal of the court below to give two instructions to the jury. They may be considered together and are as follows:

"That it appears that this defendant had no participation in any of the acts for which recovery is sought in this proceeding and in fact as the time of the commission of the alleged acts had not been incorporated. That if any alleged liability on its part is to be enforced, on the ground of any assumption by it, it can only be done in accordance with the reservation of the foreclosure decree, by an intervention in the foreclosure suit in the circuit court of the United States for the Southern District of New York, the court of primary jurisdiction in the foreclosure suit, and, therefore, your verdict should be for this defendant.

That by the decree of foreclosure in the suit in which the defendants, McCullough and Thomas, were appointed Receivers of the New York, Lake Erie and Western Railroad Company, it was expressly provided that all claims against the Receivers and all claims against the said Railroad Company entitled to priority over the mortgage should be presented for allowance and filed within six months after the publication by the Receivers of a notice to holders of such claims to present the same for allowance, and that any claims which should not be so presented or filed within such period of six months should not be enforcible against the Receivers, or against the property, or against the purchaser or purchasers, or their successors or assigns. That the Receivers caused such a notice to be published, as provided in said decree, and that the claim set up in the petition was not presented or filed within the period fixed by the said decree and such notice, and, therefore, your verdict should be for this defendant."

It appears from the record and is not disputed that the property of the New York, Lake Erie and Western Railroad Company, one of the defendants, went into the hands of the defendant McCullough and John King, as receivers, in the latter part of July, 1893, by virtue of proceedings in the circuit court of the United States for the southern district of New York and in the circuit court of the United States for the western district of Pennsylvania; that King, having resigned from the receivership, the defendant Thomas became receiver in his stead on or about May 1, 1895; that the receivers continued in possession and operation of the line of the New York, Lake Erie and Western Railroad Company, forming a portion of the through route referred to in the action below, from the latter part of July, 1893, until December 1, 1895; and that meanwhile the property, including that line, was sold under foreclosure proceedings, hereinafter more particularly referred to, and the purchasers conveyed title to the then newly created and organized Erie Railroad Company, which took possession of it December 1, 1895, and has since continuously operated it. Proceedings having been instituted on or about June 15, 1895, in the circuit court for the southern district of New York, and on or about July 1, 1895, in the circuit court for the western district of Pennsylvania, for the foreclosure of the second consolidated mortgage of the New York, Lake Erie and Western Railroad Company, dated October 3, 1878, and covering its line, and having

been consolidated with the receivership proceedings, a decree of foreclosure and sale was made in each court in the latter part of August, 1895. The Erie Railroad Company did not exact or cooperate in exacting any of the alleged overcharges for which the order of reparation was made. These alleged exactions covered the period from September 3, 1888, to May 15, 1894. The order of reparation was made October 22, 1895. The Erie Railroad Company was not in existence until November, 1895, and did not operate the line of the New York, Lake Erie and Western Railroad Company before December 1, 1895. If, then, the Erie Railroad Company, prior to the commencement of the action below, became personally liable for the amount or any portion of the amount included in the order of reparation, such liability must have resulted from the judicial proceedings for the appointment of receivers and the foreclosure of the mortgage and the sale and conveyance of the property thereunder, or have been voluntarily assumed by it in and by the deed executed to it pursuant to those proceedings, or in some other manner wholly undisclosed by the record. Hoard v. Chesapeake and Ohio Railway, 123 U. S. 222, 227, 8 Sup. Ct. 74, 31 L. Ed. 130. Doubtless under certain circumstances, and within reasonable limits, personal liability properly may be fastened by judicial decree upon a purchaser, taking title under a foreclosure sale, for the contracts or torts of the defendant in the decree prior to the commencement of the proceedings, or of the receivers while operating the property which is the subject of the foreclosure and sale. But, aside from the deed to be adverted to later, does the record disclose any liability, personal or otherwise, on the part of the Erie Railroad Company for any portion of the amount included in the order of reparation, by reason of any judicial proceedings against the New York, Lake Erie and Western Railroad Company? The decree of foreclosure and sale in the southern district of New York, which was substantially similar to that in the western district of Pennsylvania, contained, among other things, the following provisions:

"The purchaser or purchasers shall as part consideration and purchase price of the property purchased, and in addition to the sum bid, take the same and receive the deed therefor upon the express condition that he or they or his or their successors or assigns shall pay, satisfy and discharge any unpaid compensation which shall be allowed by the court to the Receivers, and any indebtedness and obligations or liabilities which shall have been contracted or incurred by the Receivers, or which may be contracted or incurred by the Receivers before delivery of possession of the property sold, whether or not represented by certificates hereafter issued, and also any indebtedness or liabilities contracted or incurred by said defendant railroad company in the operation of its railroad prior to the appointment of the Receivers, which are prior in lien or superior in equity to said second consolidated mortgage, and which shall not be paid or satisfied out of the income of the property in the hands of the Receivers, upon the Court adjudging the same to be prior in lien or superior in equity to said mortgage and directing payment thereof. * * * In the event that said purchaser or purchasers shall refuse after demand made to pay any of the before mentioned indebtedness, obligations or liabilities, the person holding the claim therefor may, upon fifteen days' notice to said purchaser or purchasers, their successor or successors, assign or assigns, file his petition in this Court to have such claim enforced against the property

aforesaid in accordance with the usual practice of this Court in relation to claims of a similar character; and such purchaser or purchasers, and his and their successor or successors, assign or assigns, shall have the right to appear and make defense to any claim, debt or demand so sought to be enforced, but either party shall have the right to appeal from any judgment, decree or order made thereon. And jurisdiction of this cause is retained by this Court for the purpose of enforcing the foregoing provisions of this decree. * * * The Receivers shall prior to the sale hereunder and as soon as practicable, file with the Clerk of this Court a statement showing as definitely as practicable all indebtedness, obligations and liabilities contracted or incurred by them remaining unpaid, and shall within two weeks prior to the time of sale file with the Clerk of this Court a further statement showing as definitely as they shall find practicable, any additional indebtedness, obligations or liabilities contracted and incurred, and outstanding, and also the amount of the indebtedness, obligations and liabilities included in such first statement which may have been discharged; but nothing contained in any such statements shall be binding upon the purchaser or purchasers at said sale. Any such claims for indebtedness, obligations or liabilities which shall not have been included in such statements of the Receivers, or which shall not have been presented in writing to the Receivers or filed with the Clerk of said Court prior to the time of delivery of possession of such property, shall be presented for allowance and filed within six months after the first publication by the Receivers of a notice to the holders of such claims to present the same for allowance. The Receivers shall publish such notice at least once a week for the period of six weeks in one or more newspapers published in * * *, upon the request of any purchaser or purchasers after delivery of possession of the property to the purchaser, and any such claims which shall not be so presented or filed within the period of six months after the first publication of such notice shall not be enforceable against said Receivers nor against the property sold nor against the purchaser or purchasers, his or their successors or assigns. Any such purchaser or purchasers, and his or their successors and assigns shall have the right to enter his or their appearance in this Court, and he or they, or any of the parties to this suit, shall have the right to contest any claim, demand or allowance existing at the time of the sale and then undetermined, and any claim or demand which may arise or be presented thereafter, which would be payable by such purchaser or purchasers, his or their successors or assigns, or which would be chargeable against the property purchased, in addition to the amount bid by such purchaser or purchasers at the sale, and may appeal from any decision relating to any claim, demand or allowance according to the law and practice of said court."

Pursuant to the decree of sale, the property of the New York, Lake Erie and Western Railroad Company in the hands of the receivers, was sold by a special master November 6, 1895, to Charles H. Coster, Lewis Fitzgerald and Anthony J. Thomas; and the circuit court of the United States for the southern district of New York made a decree November 9, 1895, confirming the sale, in which, after reciting that the sale was subject to the "mortgages, receivers' debts and other preferential liens and claims, and to all and singular the terms and conditions in said decree set forth," it was said:

"The same is, in all things ratified, approved, confirmed and made absolute. subject, however, to all the mortgages, receivers' debts and preferential claims. and to all equities reserved and to all and singular the conditions of purchase as recited in such decree, and the continued right of the Court to adjudge and declare what Receivers' or corporate debts are prior in lien or in equity to the lien of the mortgage herein foreclosed, or ought to be paid out of such proceeds of sale in preference to the mortgage bonds; and this Court expressly reserves for future adjudication and power thereby to bind the property sold, all liens, claims and equities specified in and reserved by the said final decree of foreclosure so as aforesaid entered on August 21, 1895."

After accepting Coster, Fitzgerald. and Thomas as purchasers and as such bound to comply with the order of the court, the decree of confirmation provided as follows:

"That each and every obligation on account of such purchasers may be transferred to and assumed by the new corporation to be formed by them under the Railroad Law of the State of New York as successor to the said the New York, Lake Erie and Western Railroad Company. * * * And the court further reserves full power from time to time to enter orders binding upon such purchasers or their said transferee, requiring them to pay into the registry of the court all such sums as have been or may be ordered by the court for the payment of any and all Receivers' debts or claims adjudged or to be adjudged as prior in lien or equity to the mortgage herein foreclosed, or entitled to preference in payment out of the proceeds of sale."

The court also reserved "full power notwithstanding such conveyance and delivery of possession to retake and resell the property" if the purchasers or the new corporation as their transferee, should fail to pay into court all sums thereafter ordered to be so paid to discharge "any and all such debts, liens or claims as it may decree ought to be paid out of the proceeds of sale in preference to the mortgage. herein foreclosed." The record does not disclose any personal liability on the part of the Erie Railroad Company enforcible in the action below for the payment of the whole or any portion of the pecuniary reparation ordered by the commission, by virtue of the foreclosure proceedings or the judicial confirmation of the sale thereunder, or either of them. The property of the New York, Lake Erie and Western Railroad Company was decreed to be sold subject to the condition that the purchasers or their assigns should pay, satisfy and discharge (1) any unpaid compensation to be allowed to the receivers, (2) "any indebtedness and obligations or liabilities" which should have been contracted or incurred by the receivers before the delivery of possession of the property sold, (3) "any indebtedness or liabilities contracted or incurred by said defendant railroad company in the operation of its railroad prior to the appointment of the receivers, which are prior in lien or superior in equity to said second consolidated mortgage, and which shall not be paid or satisfied out of the income of the property in the hands of the receivers, upon the court adjudging the same to be prior in lien or superior in equity to the said mortgage and directing payment thereof." There was a general provision, applicable to all of the above clauses, to the effect that in case of refusal by the purchasers or their assigns, after demand, to pay "any of the before mentioned indebtedness, obligations or liabilities," the "person holding the claim therefor" might after fifteen days' notice to the purchasers or their assigns file his petition in the court entertaining the foreclosure proceedings "to have such claim enforced against the property aforesaid in accordance with the usual practice of this court in relation to claims of a similar character," and that "jurisdiction of this clause is retained by this court for the purpose of enforcing the foregoing provisions of this decree." The decree of confirmation states that the sale was subject to "all and singular the terms and conditions in said decree set forth,"

and, more specifically, (1) to "mortgages, Receivers' debts and preferential claims," (2) to "all equities reserved and to all and singular the conditions of purchase as recited in said decree" and (3) to "the continued right of the court to adjudge and declare what Receivers' or corporate debts are prior in lien or in equity to the lien of the mortgage herein foreclosed, or ought to be paid out of such proceeds of sale in preference to the mortgage bonds"; the court reserving "for future adjudication and power thereby to bind the property sold all liens, claims and equities specified in and reserved" by the decree of foreclosure and sale. In addition to the reservation of power just mentioned, the court reserved power (1) to require the Erie Railroad Company "to pay into the registry of the court all such sums as have been or may be ordered by the court for the payment of any and all Receivers' debts or claims adjudged or to be adjudged as prior in lien or equity to the mortgage herein foreclosed, or entitled to preference in payment out of the proceeds of sale," and (2) to resell the property sold if the Erie Railroad Company failed to pay into court all sums thereafter ordered to be paid to discharge "any and all such debts, liens or claims as it may decree ought to be paid out of the proceeds of sale in preference to the mortgage herein foreclosed." It is clearly to be gathered from the provisions of the decree of foreclosure and confirmation that no personal liability, if, indeed, any liability, arising from a mere tort whether of commission or omission, on the part of the New York, Lake Erie and Western Railroad Company or its receivers, was intended to be enforcible against the Erie Railroad Company as purchaser, until after such personal liability should be adjudged, established and allowed in the exercise of the power reserved to the court in the foreclosure proceedings. But it does not appear that any portion of the reparation ordered by the commission was adjudged, established or allowed in connection with those proceedings. The deed from the purchasers to the Erie Railroad Company was offered by the counsel for the plaintiff as "made in pursuance" of the decrees of sale and, while the record does not disclose a copy of the entire deed, it fairly may be assumed that it referred by recital or otherwise to the terms and conditions in those decrees pursuant to which it was made. Its language must, therefore be read in the light of those terms and conditions. If, aside from all assignments of error other than those under immediate consideration, the Erie Railroad Company could be held personally liable for the exaction of alleged unlawful overcharges by the New York, Lake Erie and Western Railroad Company, or its receivers, the ground must be that by the execution by the Erie Railroad Company of the deed in the foreclosure proceedings it voluntarily assumed such liability. Any supposition that the Erie Railroad Company intended by executing the deed to become pecuniarily liable for other purposes and otherwise than provided for in the decrees of foreclosure and confirmation, or that the other parties to the deed intended that there should be such a departure in it from those decrees, is so unreasonable as to be inadmissible in the absence of clear and convincing language

unmistakably disclosing such intent. We find no such language in the portions of the deed spread upon the record. The deed provided that the property thereby conveyed should be

"Subject, also, to the lien and charge of all liens and incumbrances prior or superior to the mortgage herein above mentioned, and * * * subject to all indebtedness of the said Receivers as such, incurred or to be incurred by them during their receivership and remaining unpaid, which said indebtedness is, by the judgment aforesaid, charged upon the mortgaged premises as a lien prior to the mortgage hereinabove mentioned; it being the true intent and meaning of these presents that all and singular the liabilities incurred by, or enforceable against the said Receivers, of every nature and description, arising out of any acts done or omitted to be done by them, in good faith, as such liabilities now exist, or may at any time hereafter be established, or against any property hereby conveyed, or against them on account of such conveyance, do and shall constitute a lien and charge upon all and singular the premises hereby conveyed to the party of the second part, as fully, to all intents and purposes, as such liabilities, or any of them, would or could constitute such lien or charge upon the said premises, had the same or any part thereof continued to remain in the hands, possession and custody of the said John G. McCullough and Eben B. Thomas, Receivers; and the said lien and charge hereby created and declared shall rank in order of priority before any future or subsequent lien or charge that may be created and imposed upon the premises, or any part thereof, by the said party of the second part, in any manner or form whatsoever; and the said lien or charge hereby created and declared, or any claim to any specific part or portion of the premises under or by virtue of title paramount, is hereby declared to be, and the same shall be, enforceable against the said party of the second part, in the same manner and to the same extent that the same might have been enforced against the said John G. McCullough and Eben B. Thomas, if they had continued to be such Receivers in actual possession of the premises."

Certainly down to this point the deed does not show an assumption by the Erie Railroad Company of any personal liability on its part for any mere tort of omission or commission by the New York, Lake Erie and Western Railroad Company. The deed proceeds:

"In consideration whereof, the said Erie Railroad Company, party of the second part does hereby covenant and agree, to and with the said parties of the first part, their successors and assigns, that it will truthfully and truly assume, fulfill and perform on its part each and every of the liabilities above referred to, whatever the form or nature thereof, and will pay off and discharge all the liabilities and indebtedness or liabilities incurred, or to be in·curred, by said Receivers, and charged upon the said mortgaged premises as herein above set forth, and will fully indemnify and save harmless the said Receivers, and each of them, from and against any such indebtedness or liabilities, and every part thereof, to whomsoever due, and from and against all cost, expense or charges which may arise or accrue out of or concerning the same: Also, that it will assume, and it does hereby assume, all the acts of the said Receivers done by them at any time in the due execution of their office as such, and all liabilities aforesaid, and will at all times indemnify and save harmless the said John G. McCullough and Eben B. Thomas, Receivers, from and against all liability, damage, cost and expense arising or which may arise in any manner aforesaid."

By the above clause the Erie Railroad Company agreed to "fulfill and perform * * * each and every of the liabilities above referred to" and to "pay off and discharge all the liabilities and indebtedness or liabilities incurred, or to be incurred, by said Receivers and charged upon the said mortgaged premises or herein-

above set forth," and to "assume all the acts of the said Receivers done by them at any time in the due execution of their office as such, and all the liabilities aforesaid." But unlawful overcharges exacted by the New York, Lake Erie and Western Railroad Company were not included in the "liabilities above referred to" or the "liabilities aforesaid"; nor is there any evidence that they were "charged upon the said mortgaged premises as hereinabove set forth," or that they arose "in any manner aforesaid." The deed further proceeds:

"Also, that if any liability shall be in any manner established against the said John G. McCullough and Eben B. Thomas, or either of them, individually, or as Receivers, as aforesaid, for the payment of any claim or demand, of whatsoever nature, or any part of any claim or demand, legally or equitably entitled to satisfaction out of any property or estate heretofore and hereby granted or assigned, then that the said party of the second part will at once assume and pay any liability so established, and will fully indemnify and save harmless the said John G. McCullough and Eben B. Thomas therefrom, and from all loss, cost and damage which may arise or accrue out of or concerning the same; the true intent of this clause being to require the said party of the second part always to take care of and pay any sum or sums of money which the said McCullough and Thomas, as Receivers, have become liable for, or which it may be established the said McCullough and Thomas, as Receivers, ought to pay or have paid out of any property and estate which by this indenture are conveyed or assigned unto the said party of the second part, and as fully to protect the said John G. McCullough and Eben B. Thomas, Receivers, as if they or either of them had retained in their or his hands and possession funds and estate for the satisfaction of any and all such claims and demands."

The record discloses no evidence that, prior to the action below, the claim for alleged unlawful overcharges by the New York, Lake Erie and Western Railroad Company was "in any manner established," in connection with the foreclosure proceedings or by any court, against any person or property. The Erie Railroad Company agreed to assume "liability so established" or "which it may be established" the receivers ought to pay or have paid out of the property conveyed. We are unable to perceive that the Erie Railroad Company became liable either by the foreclosure proceedings or the deed for any overcharges which unlawfully may have been exacted by the New York, Lake Erie and Western Railroad Company. Yet such alleged unlawful charges by that company are included in the judgment below which is in solido against all the defendants. It further appears that the receivers after the sale under the decree of foreclosure duly caused six weeks' notice to be published for the presentation of claims within the period therein required, and it does not appear that the claim in controversy was "presented in writing to the Receivers or filed with the Clerk of said Court" at any time prior to the action below. On the part of the plaintiff there was an offer of incompetent evidence to show that the claim in controversy was so presented. This evidence was admitted against the objection of the Erie Railroad Company that it was incompetent, and its admission is specifically assigned by that company as error. Under the terms of the decree such claim, if it ever had legal existence, was not "enforceable against said Receivers nor against the property

sold nor against the purchaser or purchasers, or his or their successors or assigns," and therefore not enforcible against the Erie Railroad Company. We think there was substantial error in the matters to which the assignments last considered relate.

Error has been assigned by McCullough and Thomas, receivers of the New York, Lake Erie and Western Railroad Company, to the refusal of the court below to charge the jury as follows:

"That the defendants have duly accounted for all funds which came into their hands as such receivers and have been discharged by the order of the Circuit Court of the United States for the Southern District of New York. which originally appointed them, and also by the order of this court, and therefore, the verdict should be for these defendants."

The record shows that the receivers were finally and unqualifiedly discharged and released from all liability and their bonds directed to be canceled, in the southern district of New York February 4, 1897, and in the western district of Pennsylvania February 19, 1897, more than four years before the bringing of the action below. There is no evidence of any vacation of these orders of discharge or either of them or of any application in that behalf. Under these circumstances McCullough and Thomas could not be held liable as receivers at the time the action below was brought. Lehman v. McQuown (C. C.) 31 Fed. 138; Davis v. Duncan (C. C.) 19 Fed. 477; Farmers' L. & T. Co. v. Central R. of Iowa (C. C.) 7 Fed. 537; Jesup v. Wabash, St. L. & P. Ry. Co. (C. C.) 44 Fed. 663, 665, 666; Beach on Receivers, §§ 725, 802; Smith on Receiverships, § 286; Anderson on Receivers, § 586. The court below did not in its charge to the jury include in words or substance the instruction asked for. The receivers were entitled to it and there was error in denying it.

There are a number of assignments to portions of the charge, and to the refusal of instructions, touching the lawfulness or unlawfulness of the barrel package charges complained of. These assignments cannot be sustained. Whether a given transportation charge is just and reasonable, or unreasonable and excessive, is peculiarly a question for a jury. In Texas & Pac. Railway v. Interstate Com. Com., 162 U. S. 197, 219, 16 Sup. Ct. 666, 675, 40 L. Ed. 940, the court said:

"The third section forbids any undue or unreasonable preference or advantage in favor of any person, company, firm, corporation or locality; and as there is nothing in the act which defines what should be held to be due or undue, reasonable or unreasonable, such questions are questions not of law, but of fact."

We perceive no reason why the principle here enunciated should not be applicable to the terms "unjust and unreasonable" as employed in the first section. Upon the facts disclosed in the record there may be room for a difference of opinion among intelligent men touching the justness and reasonableness of the alleged overcharges, and, were it not for error on other points, the question was properly left to the jury.

For the reasons hereinbefore given, and particularly in view of the invalidity of the orders of reparation on which both of the

actions are based, and others we have not deemed it necessary to discuss, the judgment below in each of the two actions must be absolutely reversed, with costs; and it is so ordered.